Mr. Schwartz. May it please the Court, there are a bevy of disputed issues of material fact here that warrant a jury trial on my client's claims. The record here is resonant of the phrase, the cover-up is worse than the crime. Why is that? Well, when there is a cover-up, it lends to a suspicion of lying that evinces mendacity such that a jury should decide the issues. This case reminds me a bit of the rubric from the McDonnell-Douglas analysis that I'm sure this Court is very familiar with in employment discrimination cases where when a defendant offers a reason for a discharge that is shown to be false, that that creates a jury issue on the question of pretext. Summary judgment is typically improper where the employer's stated explanation is proven not to be true, even if it doesn't evidence discrimination because then it goes to the jury to determine, well, why did they lie? And that question, I think, hangs over the record here is, why did they lie? There is instance after . . . So identify one or two of the factual disputes that you're referring to. Is one of them, whether there's malice, is that one of the factual disputes? Well, I think that the issue of malice, it flows from the events that are in dispute. So the question of whether or not there is evidence of mendacity by virtue of refuting facts that are shown to be true. Well, give us . . . I'll ask the question again. I complicated the question and I should not have done it. Tell us what are the factual disputes. The traffic light was red, the traffic light was green. Which was it? What are your disputes of raw material fact that you referred to in your opening? Yes, Your Honor. I think a dispute as to whether these two firms are in competition with one another is central to the dispute. You have the head of MXS testifying at a preliminary injunction hearing that they're not competitors. Where all the evidence is to the contrary. So that to me is sort of the headline of where the disputes lie. Then you get into the question of what this fellow, the underlying . . . the former defendant, Mr. McLaren, what was his job? Well, they offered him a job that showed that he had much more significant responsibility than what Mr. Schoonover testified that he was just kind of a functionary who was in charge of scheduling. So there's another dispute there. Isn't all that true, that they're in competition and his job is important and they knew about, allegedly knew about McLaren's non-competing agreement, yet hired him anyway? But I don't . . . how do you . . . how is that a showing of malice? Well, I think that at its core, this is a case, a question of intent. So what was MXS's intent in engaging in the behavior that they engaged in, in hiring somebody who had a non-compete agreement, who then allowed him to participate, even though the employees . . . they allow him to sit in the interviews. The record testimony says that his voice was a part of the consensus as to whether they would hire folks or not. My client has presented evidence that he, based on his knowledge of the employees that he was interviewing, that he intentionally cherry-picked particular employees who had exactly the expertise that would help give MXS a leg up. So what if the answer is that it was all just in pursuit of profit, which then would take them out from under the Louisiana statute? Unless the issue was really hurting the competitor. If their motivation . . . you know, it's one thing to compete fairly. It's another thing that when you're competing with at least part of your intent to hurt your competitor, where you're doing things that are unlawful or at least in question as to whether they're lawful or not. I mean, that ultimately is the question here, is whether there is sufficient evidence in this record where a jury needs to evaluate the intent. And the . . . What is the evidence that it was anything other than we want to make a buck and we don't care about this non-compete because we've made a profit calculation? If . . . So what is the evidence that it's really because they have been rivals and they hate each other or that they used to be lovers and they hate each other? You know, something that . . . doesn't it have to be something plus we want to make money and we would love for your company to fail? Yeah, I agree with that, Your Honor. I do think that if there wasn't anything that would place into question, which is the key here because this is a review of a summary judgment, you three are in a de novo situation. You're looking at the record to determine should this case go to a jury or not. If there was nothing other than we're going to hire a guy that works for the other company, we're going to bring him in and take advantage of his expertise and that was it, and allow him to hire people, then that would be fine, but . . . What else is there? That's the question. Well, there's the knowledge of the fact that he was bound by a restrictive covenant that prevented him from going to work for a competitor. Then Mr. Schoonover says at the preliminary injunction hearing, well, we're not competitors. Then he's not supposed to be hiring people and he's sitting in on interviews. So I guess my answer to your question, Judge, succinctly is they are blowing off the legal handcuffs that are placed on them by virtue of the person that they hired. Is there any case that you can point to where liability was imposed for hiring somebody, a competitor's employee that was bound by a non-compete? No, but the Louisiana Fair Trade Practice Act specifically says that these are case by case analyses, and when you have a record like we do here, where you have all these indicia of the cover-up . . . They don't care about the non-compete. I mean, if that was good enough, then you're right, there's a fact issue on that. They're blowing by the non-compete, either because they believe that it's not binding, it's got a flaw, or because they just don't care and they're willing to push you to sue them. So there is a fact issue on that, but I don't know that that's enough under Louisiana law, so help. Well, I guess it goes back to my opening remarks, Your Honor, that why lie? What is the motivation to pretending that you're not a competitor? What is the motivation to allowing somebody to have record evidence supporting that you're in a position of greater responsibility than the testimony that he's just a functionary . . . They want to try to ward off the lawsuit. They already had one. No, well, I mean, they don't . . . they want it to go away. That's why you lie. I'm not . . . it's wrong. I'm not saying lying is a good thing. I think that that's a great point, Your Honor, but do we know that? Doesn't his intent, doesn't this company's intent and motivation matter? And that is where the jury question lies. It just simply doesn't strike that this is fair competition when you engage in this sort of conduct, that it . . . you know, I'm all for competitors competing harshly. I mean, I do a lot of this restrictive covenant work. I've been on both sides of these cases, so I'm very familiar with what's right and what's wrong. This just crosses a line when you are under oath at a preliminary injunction hearing, presumably you want to win, of course, but you're saying things that are not true or at least potentially might not be true. And so again, we're here on a review of a summary judgment, and so ultimately, is there record evidence here that supports this case going to a jury to evaluate all this indicia of bad conduct or at least the issue of whether there's bad conduct? That to me is what a jury needs to decide. What question would you have the jury be asked in a federal trial? Did MXS, in engaging in the conduct that they engaged in, at least for purposes . . . I mean, the two claims kind of are married to each other, the interference with business relations and the Louisiana Unfair Trade Practice Act, because in both claims, we have to show that they did something they shouldn't have done. And so that's what the jury's going to evaluate is . . . So let me hear it again. What's the question to the jury going to read like? At closing argument or is what issue . . . You're going to ask the jury to decide a fact question, is that right? Correct. What's the question going to be? Did MXS act with malice or ill intent in engaging in the conduct that they engaged in against a competitor? Are you going to define malice or ill intent for the jury or are you going to leave that to them? I respect Justice Stewart's definition of pornography. You kind of know it when you see it. Unless there's other questions, I'll reserve the rest of my time for rebuttal. You have saved time for rebuttal. Thank you, Mr. Schwartz. Ms. Buckley? Good morning. May it please the Court. I believe the questions that you asked are exactly on point and I don't know about you but in reviewing the briefs of the appellant and in hearing the argument, I've yet to hear any specific fact issues that should be presented to the jury. This Court does have a de novo review and Rule 56 requires that the non-movement hear Saber point out specific facts in the record in order to defeat summary judgment. There are no specific facts that have been pointed out. For some reason, Saber has relied on this argument that Steve Schoonover at the preliminary injunction hearing lied about whether the two parties were competitors. Respectfully, this is a play on words. Whether we want to use the word competitors, I believe Your Honor said rivals, I'll be honest. If you're asking my opinion, I would say that they were competitors. Assuming he did lie, is there a fact issue? No, Your Honor. I don't believe that's a relevant fact issue. I don't believe it's a material fact issue. To go further, I don't believe it's a lie and I think that's a misrepresentation of his testimony. While he said that they weren't competitors, he explained the answer. He said that they weren't competitors but what he went on to say, and they even cited it in their brief, is that they were not in head-to-head competition. They had no customers that they were the same and there were no products that they were the same. They're going to be. They were but . . . They're going to have customers the same and they're going to have products the same because that's why they brought in all these people that have these expertise. But at the time, Your Honor, when he made that statement, I mean, and through, for several years through discovery in this case, there were no similar clients. I mean, the record shows that there were over a hundred customers of the parties that were looked at. None of the parties had the same customers. At the time, they were not building the same products. They certainly had the capability to do so but at the time, his statement was simply, we're not selling the same products at the same time and we don't have the same clientele at the same time. That was a true statement. Now, whether they had the ability or . . . Do they have ambitions to . . . Certainly. . . . play in that space? Certainly. Yeah. I don't believe that that was ever disputed by anyone. And so that's why I think this is simply a play on words and certainly a stretch of what his testimony was. In looking at the elements, and that's what the court has to do, you have to look at the elements of the two claims that are remaining in order to decide whether there's a fact issue in order to be presented to the jury. The first claim is whether there was tortious interference with a business relationship. They keep referring to the fact that Module X hired Mr. McLaurin but you cannot prevail on that claim of tortious interference with a business relationship because there was no action by Module X that interfered with Saber's business relationship with McLaurin. Saber fired him. That was Saber's action. There is no action of Module X that you can point to with respect to the interference with that relationship. In reviewing the brief, they point to Shannon Lee. Shannon Lee, to this day, remains an employee of Saber. There was no action of Module X, and still to this day, no evidence that Module X even spoke to Shannon Lee. On the other one, they fired him because he was being courted, isn't it? No, it wasn't. I'm not sure what . . . He wasn't being . . . I thought the timing was they were getting these emails and things, or no? There were two employees that they presented affidavits from that were courted or solicited that they alleged by Mr. McLaurin. Neither of those were ever hired by Module X. Both of them, to this day, remain employed by Saber, so no, Your Honor, there was never . . . neither one of those were ever hired by Module X. There was one that was . . . Leslie Walton had an interview scheduled with Module X, but he never even appeared for the interview, and there were no further communications. So you have to look at the actions of Module X, and they simply have not pointed to any. As far as the Unfair Trade Practices Act, again, you have to point to actions of Module X, and I don't believe that the hiring of Mr. McLaurin rises to the level of egregious action that is required in order to maintain a claim under Louisiana law. Certainly, they were looking to make a profit. They were looking to take advantage of knowledge of employees in the industry, but they were open about that. But the testimony by Mr. McLaurin, Mr. Dean, Mr. Schoonover, everyone, was that he was to come over empty-handed, that he was to bring nothing but his talents, and I believe the testimony by Jim Dean was even that he was to come over naked, and that whenever Tom Jagielski, who's at SABRE, was asked about that, he laughed and said, certainly, that sounds just like something Jim Dean would say. So they acknowledged that that was something that would happen. There's no evidence that McLaurin was hired in order to harm SABRE in any way. There's just no evidence. There's no fact disputes. There's no evidence. There's nothing other than speculation by SABRE. If the Court has no other questions about those claims, I would like to turn to the motion that was filed by Module X, seeking sanctions and or attorney's fees. Certainly, we would request that the Court affirm the district court's ruling on the motion, but that we would ask that the Court reverse and remand to the district court on the motion for attorney's fees and sanctions. This is a case . . . I think you have to look at the totality of the circumstances in order to recognize the bad faith of SABRE and the continued harassment that occurred throughout the litigation. SABRE has alleged that Module X intended to harm SABRE's business, but the truth is, when you look at it, SABRE was intending to harm Module X throughout this whole litigation. That was the purpose of commencing this litigation and continuing it. We already know that these parties were rivals. There was . . . I don't think the district court abused its discretion. You know, this is not de novo like the other . . . That's correct, Your Honor. It is abuse of discretion. I think that the way that the district court abused its discretion in this case . . . and the district court said that SABRE ultimately did the right thing, but what the district court abused its discretion is in failing to recognize the time period that it took SABRE in ultimately doing the right thing, as the district court said, there was more than at least a one-year period of time where SABRE continued fixatious litigation against Module X, causing . . . filing multiple motions, causing the parties to incur substantial expense, attorney's fees, all the while still pressuring Module X and harming their business. I do think that the time period was very significant and while . . . The parties were supportable. They needed some time to make that determination, didn't they? Yes, Your Honor, and we have acknowledged that. In my brief, I acknowledged that while we disagree, we acknowledge that there . . . to the extent that there was some . . . excuse me, a time period that the parties needed in order to review the evidence, they had that ability. This litigation was filed against Module X in September of 2019. The parties then engaged in discovery. Our position is that based on the evidence, we believe it occurred before that, but based on everything in the record, we think their own responses show that by July 7th of 2021, after almost two years of discovery, that they had that opportunity, that they'd had more than . . . How long after July 2021 was it before they voluntarily moved to dismiss claims? More than a year. It was the summer of 2022. And what did they do in the meantime? For the year, were they pressing motions on the . . . Yes, Your Honor. Yeah, and the docket sheet confirms that. They continued to file motions to compel. They continued to file motions seeking to have . . . A motion to compel. They wanted to get all the information. Well, they were asking for in-camera inspections of Module X's designs without any basis to do so. The magistrate ultimately ruled in favor of Module X on that issue, but that again goes to the showing of bad faith by Saber in pursuing this litigation and their ultimate motive in pursuing this litigation. There was no basis at all to indicate that Module X had ever obtained any designs by Saber. The evidence that they point to on the documents that were shown on the thumb drive did not contain any designs. There were production schedules and financial records, but there were no designs. But yet they filed discovery requests after discovery requests and filed multiple motions to compel seeking to have Module X produce their designs by their engineers without any basis whatsoever. So discovery was continuing after July 2021? I know you said it was baseless, but it continued. The court ruled on some discovery motions post-July 2021? Yes, Your Honor, but there was no discovery produced after July 7, 2021. By July 7, 2021, Module X had already done a complete search of all of their systems based on the search terms that Saber had provided and the court had ordered to be searched. Module X had already provided eight thumb drives resulting in hundreds of thousands of pages, and those were produced fully to Saber, and I believe those were produced by February of 2021, and in July of 2021, Saber acknowledged that they had reviewed those documents and had not found anything to indicate that Module X had obtained any confidential information or trade secrets. They didn't admit that, but in their responses, they're specifically asked, please identify what documents does Module X have, and they did not identify any. Module X never obtained any trade secrets. They never obtained any confidential information, and there was no basis to suspect that they had. Again, it was a declaration from one of the employees stating that they were building it, so there was a basis. There is a factual basis to pursue the litigation. Respectfully, Your Honor, I would disagree with that. If you look at this conversation, this is two labor workers who, I believe, quote, bumped into each other at a gas station for a 30-second conversation, and all the employee said was that Module X may start building containers like Saber. This industry, all they build is containers. This is, and the discovery shows, I mean, these are modular buildings and containers, and while they're used for a variety of different things, and certainly, I'm not an engineer and I don't have all the specifics on that, but overall, these modular foundations are used for a variety of purposes. Saber was involved in building modular foundations and containers. Module X was involved in building modular foundations and containers. They were selling to different types of customers at the time, but they had the ability. Jeff Hood, who was the Vice President of Engineering of Module X, had previously worked at Selection, which then became Saber. They had this knowledge, and Your Honor, I simply, I don't believe that that 30-second conversation between two workers was sufficient to commence this litigation, and I think it further shows the bad faith. I mean, just as an example, if an assembly line worker leaves Tesla and goes to work for Ford, and there's a similar conversation where the former employee says, yes, Ford's going to start making electric vehicles like Tesla. Well, Ford already has that capability. They're not doing the exact type of vehicles, but they have the ability to do electric vehicles and already have their own type. That's not sufficient for Tesla to then file a lawsuit against Ford, arguing that they've, to allege that they've obtained confidential information and trade secrets. You have to have more than that, and in this case, there's nothing. All they have is the conversation between the two workers at a gas station that said they may start building containers. That's not enough, and that's why this motion was filed pursuant to Rule 11 and under the Federal Defend Trade Secret Act, because Module X does believe that Saber was in bad faith in filing this claim and pursuing it for years. I would point to a couple of things in the record that I think further support Module X's position on this. One is the witness list. It's located in the record at page 3095. It's Saber's witness list that was filed that identifies the witnesses they intended to call at the trial of this matter. None of them support the claims of solicitation by Module X of former Saber employees. They listed no witnesses and further demonstrate that they had no evidence. Most importantly, I think, is the Saber's supplemental discovery responses that were finally court-ordered. That's located in the record at page 3024. Multiple times, Saber responds, to date, Saber has not discovered specific information or documents in its possession, custody, or control to confirm that McLaurin and or MXS intentionally interfered with Saber's existing business relationships or valid business expectancies by inducing or causing Saber's employees to leave their employment for MXS. Saber has admitted that repeatedly that they have no evidence that MXS induced or caused Saber employees to leave their employment for MXS. Yet, here we are still on appeal with them making that very argument. That's why Module X believes Saber is in bad faith. They've already admitted the lack of evidence, but they're continuing to pursue that claim. Also is the false statement that was made in the complaint that said that McLaurin personally worked with Saber's clients and that Module X was using confidential information and trade secrets in order to interfere with those business relationships. Only after Saber was court ordered to respond did Saber admit that McLaurin never worked with any customers. He didn't have personal contact with customers other than brief introductions while they were there at the facility, and he never serviced any clients. If you look at the record as a whole, we believe there are numerous examples of bad faith of the McLaurin family. We would request that the court reverse the court's ruling on the motion for sanctions or attorney fees and remand. Thank you. Thank you, Ms. Buckley. Mr. Schwartz for rebuttal. May it please the court, let me just touch quickly on the attorney fee issue. It seemed that a fair amount of the contention of bad conduct by my client was connected to discovery, and Rule 37 covers the mechanism for sanctions with regard to discovery. That was never ruled on by the judge, wasn't presented to the judge, and that's not before the court. The determination by the district court judge not to award attorney fees as the panel has indicated was well within his discretion. He had great familiarity with the record, great familiarity with the case, and it was not abused. What about the section in the complaint that Ms. Buckley just referred to and claimed that you admitted it in response that you had no evidence of that? My understanding is that counsel was conflating a response of no documentary evidence. Testimonial evidence has the same weight as documents do, and so the fact that there weren't documents to support the claim doesn't mean the claim can't be supported. There's still, as I presented in my opening arguments, there's testimonial evidence in the record that would support my client's claims. The fact that there aren't documents doesn't destroy the claim. Going again to the case in chief and primarily in response to Judge Graves' question, one of the cases that we cited in our supplemental submission, our 28-J submission, was the Chemical Distributions, Inc. v. Exxon Corp. case, 1F3rd of 1478. In that case, this court upheld or denied a Rule 50 motion, which essentially is the same approach on a summary judgment other than the fact that a jury had already ruled. And in doing so, in discussing a Louisiana Unfair Trade Practice Act claim, this court said that an intent to eliminate the competition does not by itself violate the statute, which is what Judge Elrod said. But then it goes on to say, rather, the statute forbids businesses to destroy each other through improper means. And that's the fact question, is were there improper means here utilized by MXS? In this chemical distribution decision by the Fifth Circuit, the court pointed to certain conduct by Exxon, which it said were at the very least deceptive, a rather low standard to evaluate whether conduct is raising to a level of improper means. And so, our position is that the record has sufficient information in it that would support a jury question. We're not asking this court to reverse and render. We're asking this court to reverse and remand so that this case can proceed and let a jury evaluate whether Sabre's misconduct violated the statute and was a tort. If there's no further questions, I have nothing further. All right, thank you, Mr. Schwartz. Thank you. You're under submission.